**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. _____

Andrew John "AJ" Nally, an individual,

     Plaintiff,

 v.

Momentum Volleyball Colorado, A Colorado nonprofit corporation,

Melisa Miller, an individual,

J. Randal Miller, an individual,

     Defendants.

---

## COMPLAINT

---

COMES NOW, the Plaintiff, Andrew John "AJ" Nally, by and through his attorney, Thomas H. Mitchiner of Mitchiner Law, LLC, submits his Complaint against Defendants, Momentum Volleyball Colorado, Melissa Miller and J. Randal Miller, and in support states as follows:

### Nature of the Case

This is a wage and hour case arising out of Momentum Volleyball Colorado's failure to pay Andrew John "AJ" Nally overtime as required by the Colorado Wage Claim Act and the Fair Labor Standards Act, and against Melissa Miller and J. Randal Miller for their failure to pay Andrew John "AJ" Nally overtime as required by the Fair Labor Standards Act. In addition, AJ Nally asserts common law breach of contract and

1

promissory estoppel claims against Momentum Volleyball Colorado, Melissa Miller and J. Randal Miller.

## **Parties**

1)      Plaintiff, Andrew John "AJ" Nally [Nally] is a resident of the City and County of Denver, State of Colorado.

2)      Defendant, Momentum Volleyball Colorado [Momentum], is a Colorado nonprofit corporation with its principal offices in Arapahoe County, Colorado.

3)      Melissa Miller is a resident of the State of Colorado.

4)      J. Randal Miller is a resident of the State of Colorado.

5)      Momentum is an employer under the Fair Labor Standards Act [FLSA] and the Colorado Wage Claim Act [CWCA].

6)      Melissa Miller and J. Randal Miller are employers under the FLSA.

7)      Unless necessary for clarity Melissa Miller and J. Randal Miller will be referred to collectively herein as Miller.

8)      Similarly, unless necessary for clarity Melissa Miller, J. Randal Miller and Momentum will be referred to collectively herein as Momentum.

9)      Nally is an employee under the FLSA and the CWCA.

10)     Nally worked for Momentum from August 1, 2017 through May 18, 2019.

11)     Momentum did not pay Nally overtime during this entire period of time, despite the fact that Nally regularly worked over 40 hours in a week or over 12 in a day.

## Jurisdiction and Venue

12)     Jurisdiction is asserted pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1367.

13)     This is an action authorized and instituted pursuant to the FLSA, 29 U.S.C § 201 *et. al.*

14)     All claims arose in the Judicial District of this Court. Venue is proper in this Court pursuant to 28 U.S.C. § 1391 (b) (c).

15)     Momentum is a covered employer under the FLSA because it serves the general public in competition with ordinary commercial enterprises, such as for-profit volleyball camps, clubs and leagues. *Tony & Susan Alamo Found. v. Sec'y of Labor*, 471 U.S. 290, 297 n.14 (1985); 29 CFR § 779.214.

16)     This Court has supplemental jurisdiction over Nally's state law claims.

## General Allegations

17)     Prior to being hired by Momentum, Nally worked as a Division 1 volleyball coach at Grand Canyon University [GCU].

18)     Nally worked for GCU as a W-2 employee.

19)     While working at GCU Nally operated Belle Demay d/b/a AJ Nally Volleyball, under which Nally conducted camps and clinics.

20)     In June of 2017 Nally moved to Colorado.

21)     From June 2017 through September 2017, Nally worked on his own business developing a volleyball training and coaching application.

22)     In September 2017 Nally got married.

23)     After the wedding Nally and his wife wanted to operate a business together.

24)    In September of 2017, Nally dissolved Belle Demay d/b/a AJ Nally Volleyball, and Nally and his wife incorporated Over the Top, LLC d/b/a Four Athletes.

25)    Nally primarily incorporated Over the Top, LLC d/b/a Four Athletes for his volleyball training and coaching application.

26)    In July 2017 Nally begin working for Momentum as a court coach.

27)    From July 2017 to August 2017 Nally and Momentum talked about Nally going to work for Momentum on a more permanent basis and in a position of more responsibility.

28)    On or about August 1, 2017 Momentum and Nally entered into an agreement titled "INDEPENDENT CONTRACTOR ENGAGEMENT AGREEMENT"

29)    On or about August 1, 2018 Momentum and Nally entered into an agreement titled "INDEPENDENT CONTRACTOR ENGAGEMENT AGREEMENT"

30)    Subsequently, on or about August 5, 2018 Momentum and Nally entered into an agreement titled "2018-2019 COACHING ENGAGEMENT AGREEMENT."

31)    The Independent Contractor Engagement Agreement dated August 1, 2017 and the Independent Contractor Engagement Agreement dated August 1, 2018 contain identical terms and conditions.

32)    The INDEPENDENT CONTRACTOR ENGAGEMENT AGREEMENT dated August 1, 2017 and dated August 1, 2018 will be referred to herein as the Contractor Agreement.

33)    The COACHING ENGAGEMENT AGREEMENT for 2018-2019 will be referred to herein as the Coaching Agreement.

4

34)     The Contractor Agreement and Coaching Agreement [Collectively known herein as Agreements] governed Nally's relationship with Momentum.

35)     Under the Contractor Agreement, Momentum was to pay Mr. Nally $4,000.00 per month through July 31, 2019 for performing services such as: (1) assisting Momentum's team coaching staffs at practices and tournaments (as needed); (2) assisting with the assessment and development of coaches; (3) assisting Momentum's athletes in connection with their college preparation, recruiting and selection process; and, (4) such other services that Nally and the club agree upon.

36)     The Contractor Agreement provided Momentum with substantial control over Nally's day to day duties at Momentum. Under the Contractor Agreement Nally was required to:

a)  Perform coaching assessments;

b)  Attend tournaments;

c)  Run camps, and;

d)  Establish leagues.

37)     The Contractor Agreement severely restricted Nally. Under the Contractor Agreement Nally:

a)  Could not coach or perform other activities for any volleyball club in the United States during the duration of the agreement;

b)  Could not assign the Contractor Agreement without Momentum's approval;

c)  Could not engage in private coaching activities unless it was for Momentum athletes and only if it did not interfere with his duties to Momentum and that

5

he was compensated in accordance with Momentum's fee structure.

38)    Further, under the Contractor Agreement Momentum could use Nally's image on promotion and advertising material.

39)    Momentum provided Nally with the equipment needed for him to perform his role under the Contractor Agreement.

40)    Momentum provided Nally with Momentum labeled clothing and uniforms.

41)    Under the Coaching Agreement, Momentum agreed to pay Nally $1,000.00 per month from November 10, 2018, through April 10, 2019, for his coaching of Momentum's 18 Nally team.

42)    In performing his responsibilities under the Coaching Agreement Momentum required Nally:

    a) To utilize Momentum's Coaching Handbook;

    b) To interact regularly with players and players' parents by providing feedback;

    c) To comply with Momentum's standards and requirements concerning the eligibility of athletes;

    d) To enforce the club's code of conduct;

    e) To have any travel preapproved by the club; and,

    f) To work exclusively for Momentum.

43)    The Coaching Agreement allows Momentum to terminate the agreement with five days' notice without incurring a penalty but provides that if Nally terminates the agreement that he would have to pay liquidated damages in the amount of $2,000.00.

44)     Moreover, under the Coaching Agreement if Nally missed three events, Momentum could reduce his pay by $40 for each successive event he misses.

45)     In addition, to the responsibilities outlined above in the contracts, Momentum also required Nally: (1) to attend Staff meetings; (2) to interview potential coaches selected by Momentum and to provide feedback to Momentum regarding potential coaches; and, (3) to instruct coaches on proper volleyball coaching technique.

46)     Further, if Nally wanted to conduct a volleyball camp through his own business, Four Athletes, in Colorado the contract required him hold those camps at Momentum and to pay Momentum a court fee.

47)     Momentum also listed Nally on its website as a member of its staff.

48)     Momentum indicates that Nally is the Coaching Director coaching 18 Nally and working as part of the administration of Momentum.

49)     Further, upon information and belief without Nally's knowledge or consent Momentum listed Nally as a member of its board of directors on federal forms, and without actually placing Nally on the board of directors.

50)     Momentum introduced and represented Nally as its employee to parents, other coaches and other clubs.

51)     Moreover, Momentum had Nally represent it at coach meetings, Coaches Informational Clinics and at parent meetings.

52)     However, Nally had no authority to discipline or terminate coaches without Momentum's approval.

53)     Nally regularly worked more than 40 hours per week for which Momentum

did not compensate him properly.

54)     While working for Momentum Nally continued to operate and run camps and clinics separate from his work as an employee of Momentum through Four Athletes.

55)     In addition, Nally created, ran and operated camps and clinics for Momentum.

56)     Nally ran all the camps and clinics at Momentum because the Agreements required Nally to run the camps at Momentum and the Agreements also required Nally to utilize Momentum's fee structure.

57)     Momentum controlled the amount of money Nally could make from his Four Athletes' camps.

58)     Momentum also charged Four Athletes money to operate his camps and clinics at its location, this typically took the form of a court fee.

59)     Momentum collected all of the fees for a majority of the camps and clinics Four Athletes ran.

60)     Momentum collected the fees for the Four Athletes camp or clinic, deducted the money Four Athletes owed it for holding the camp, and then paid Four Athletes the remainder of the money, it had earned for holding the camp, which was separate from Nally's work under the Agreements, but also contractually required.

61)     Initially, Momentum paid Nally individually for his work under the Agreements.

62)     On September 7, 2018 Nally's accountant informed Nally that for accounting purposes it would be easier if Momentum made all payments to Four Athletes

instead of to Nally individually.

63)     The accountant suggested this because Momentum was already paying Four Athletes for the camps it held at Momentum and Nally for his work under the Agreements.

64)     Nally asked Momentum if this could be arranged and Momentum agreed to pay Four Athletes for all work performed by individually by Nally.

65)     Momentum asked Nally to enter into a new Agreement with them under Four Athletes so that the contract and the 1099 issued by Momentum matched; therefore, The parties reentered into the exact same contract that Nally had entered into as an individual, however, the parties replaced Nally with Four Athletes.

66)     The fact that Momentum paid Four Athletes and not Nally for Nally's work is of little relevance in determining his employment status.  *Powers v. Emcon Associates, Inc.*, Civ. No. 14-cv-03006-KMT, 2017 WL 4075766 at *5 (D.Colo. Sep. 14, 2017).

67)     Towards the middle of May of 2019, Nally and Momentum met to discuss issues that had arisen during the 2018-2019 year.

68)     As these discussions progressed, it became clear that the contract would not be renewed.

69)     In a meeting on May 18, 2019, between Nally and Momentum, it was agreed by both parties that the contracts would not be renewed. Further, the parties agreed that Momentum would pay Nally $4,000.00 for June and $4,000.00 for July.

70)     In addition, the parties agreed that Nally could hold his previously scheduled Four Athletes volleyball camp in June and all other lessons and clinics he had

already planned for the remainder of May and June at Momentum.

71)     Nally and Momentum did not discuss changing the previously agreed upon court fee.

72)     However, after Nally held his camp Momentum raised the court fee price from $15 per hour to $35 per hour.

73)     Momentum applied the $35 court fee to all of the clinics and lessons Nally coached in June.

74)     Momentum has refused to pay Nally the $4,000.00 it owed him for June and July. Momentum has not paid him this money because he removed a document from a shared drive concerning his 18 Nally team which concluded in April. The document only contained information pertinent to the athletes that participated on that specific team. These documents have been returned.

75)     On or about July 19, 2019 Nally sent a demand letter to Momentum requesting that it pay him his earned, vested and determinable overtime.

76)     As of the date of the filing of this Complaint Momentum has not tendered any monies to Nally.

77)     Nally currently works as a W-2 employee for a volleyball club which competes with Momentum.

**First Claim for Relief**
(Overtime Fair Labor Standards Act – All Defendants)

78)     The foregoing allegations are realleged and incorporated by reference.

79)     Momentum, Melissa Miller, and J. Randal Miller at all relevant times were employers within the meaning of the FLSA.

80)    Momentum, Melissa Miller, and J. Randal Miller at all times relevant employed Nally within the meaning of the FLSA.

81)    Momentum, Melissa Miller, and J. Randal Miller improperly classified Nally as an independent contractor.

82)    Momentum, Melissa Miller, and J. Randal Miller should have classified Nally as an employee because at all times Nally was economically dependent on Momentum, Melissa Miller, and J. Randal Miller, and Momentum, Melissa Miller, and J. Randal Miller exercised control over Nally.

83)    Under the Agreements Nally could not work for another volleyball club while he worked for Momentum.

84)    Under the Agreements Nally could only earn extra money or increase his profits with the approval of Momentum, Melissa Miller, and J. Randal Miller.

85)    Even if Momentum, Melissa Miller, and J. Randal Miller approved of Nally performing extra work Nally could not set his fees as he had to abide by Momentum, Melissa Miller, and J. Randal Miller fee schedule.

86)    Under the Agreements Nally had to attend events and perform certain functions or Momentum, Melissa Miller, and J. Randal Miller could fine him.

87)    Momentum, Melissa Miller, and J. Randal Miller provided all of the equipment necessary for Nally to perform his role, such as providing him with an iPad, coaching guidelines and volleyballs.

88)    Nally had to perform his work at Momentum or at a place of Momentum's choosing.

89)     Nally could only set his schedule within the confines and requirements of Momentum, leaving him very little freedom to actual set his own schedule.

90)     Upon information and belief, Momentum, Melissa Miller, and J. Randal Miller represented to the Internal Revenue Service that Nally was on Momentum's board of directors without Nally's knowledge, and without actually placing him on the board of directors.

91)     As coaching director, Nally was central to Momentum's operations.

92)     Other volleyball clubs in Colorado treat Head Coaches and Coaching Directors as employees.

93)     Nally regularly worked over 65 hours a week. Exhibit 1.

94)     Momentum, Melissa Miller, and J. Randal Miller did not pay Nally at a rate of one and a half times his regular rate of pay for all hours he worked over 40 in a week.

95)     As a result, Nally suffered damages in an amount to be proved at trial.

### Second Claim for Relief
(Overtime Colorado Wage Claim Act – Momentum Volleyball Club)

96)     The foregoing allegations are realleged and incorporated by reference.

97)     Momentum at all relevant times was an employer within the meaning of the CWCA

98)     Momentum at all times relevant employed Nally within the meaning of the CWCA.

99)     Momentum improperly classified Nally as an independent contractor.

100)    Momentum should have classified Nally as an employee because Nally is not customarily engaged in an independent trade, and because Momentum had the right

to exercise control over Nally in the contract and actually exercised control over Nally.

101)   Nally regularly worked over 65 hours a week. Exhibit 1.

102)   Momentum, Melissa Miller, and J. Randal Miller did not pay Nally at a rate of one and a half times his regular rate of pay for all hours he worked over 40 in a week.

103)   As a result, Nally suffered damages in an amount to be proved at trial.

### Third Claim for Relief
(Breach of Contract – Momentum Volleyball Club)

104)   The foregoing allegations are realleged and incorporated by reference.

105)   In May 2019 Nally and Momentum agreed that Nally's roles and duties would be terminated immediately but that Momentum would pay Nally through July 2019.

106)   Momentum agreed to pay Nally $4,000.00 per month plus the money that Momentum collected for Nally's lessons and clinics, less Nally's court fee charges.

107)   Momentum should have paid Nally $9,845.00 but only paid Nally $5,169.83.

108)   Momentum failed to pay and owes Nally $4,675.17.

109)   Momentum did not honor its agreement to pay Nally because Nally removed the 18 Nally team binder from Momentum.

110)   Nally subsequently returned this information to Momentum.

111)   Momentum did not pay Nally the money because instead of charging Nally $15.00 per hour for court fees for his camps, clinics and other lessons it charged him $35.00 per hour.

112)   Throughout his time at Momentum, Momentum only charged him $15.00 per hour for court time.

113)   Nally and Momentum never agreed that Nally would be charged $35.00 per

hour for court time.

114)   Momentum breached the contract by not paying Nally the entirety of the money it promised him, even though Nally substantially performed his responsibilities under the agreement.

115)   As a result, Nally suffered damages in an amount to be proved at trial.

### Request for Relief

WHEREFORE, Plaintiff, AJ Nally, respectfully prays for a judgment to be entered against the Momentum Volleyball Colorado, Melissa Miller and J. Randal Miller as follows:

A.  Against Momentum Volleyball Colorado, Melissa Miller and J. Randal Miller for unpaid overtime pursuant to the Fair Labor Standards Act, as allowed by law;

B.  Against Momentum Volleyball Colorado, Melissa Miller and J. Randal Miller for liquidated damages pursuant to the Fair Labor Standards Act, as allowed by law;

C.  Against Momentum Volleyball Colorado for unpaid overtime pursuant to the Colorado Wage Claim Act, as allowed by law;

D.  Against Momentum Volleyball Colorado for unpaid penalties pursuant to the Colorado Wage Claim Act, as allowed by law;

E.  Against Momentum Volleyball Colorado for an additional 50% penalty because it willfully violated the Colorado Wage Claim Act, as allowed by law;

F.  Against Momentum Volleyball Colorado, Melissa Miller and J. Randal Miller, LLC for attorney fees and costs available to Nally as allowed by the Fair

Labor Standards Act and the Colorado Wage Claim Act;

G.  Costs, as allowed by law; and

H.  To award Nally all other legal and equitable relief, to which Nally is entitled

pursuant to any law, that this Court deems just, equitable, and proper.

Respectfully submitted on December 18, 2019

Mitchiner Law, LLC

by:

/s/ Thomas H. Mitchiner
Thomas H. Mitchiner
Mitchiner Law, LLC
1888 N. Sherman St., Ste 200
Denver, CO 80203
Phone: 720-538-0371
tmitchiner@mitchinerlawllc.com
Attorney for Plaintiff AJ Nally

Address of Plaintiff:

3640 Lipan St. Denver, CO 80211.